L7MAACHAC                    Conference

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        21 CR 412 (JSR)

5    JEVAUN CHARLES,

6              Defendant.

7    ------------------------------x

8                                        New York, N.Y.
                                         July 22, 2021
9                                        4:00 p.m.

10
     Before:
11
                     HON. JED S. RAKOFF,
12
                                         District Judge
13

14                      APPEARANCES

15   AUDREY STRAUSS
          Acting United States Attorney for the
16        Southern District of New York
     JACOB H. GUTWILLIG
17        Assistant United States Attorney

18   DONNA R. NEWMAN
          Attorney for Defendant Charles
19

20

21

22

23

24

25

| | |
|---|---|
| 1 | (Case called) |
| 2 | MR. GUTWILLIG:  Good afternoon, your Honor. |
| 3 | Jacob Gutwillig, for the government. |
| 4 | THE COURT:  Good afternoon. |
| 5 | MS. NEWMAN:  Good afternoon, your Honor. |
| 6 | Donna R. Newman, on behalf of Mr. Jevaun Charles, who |
| 7 | is standing next to me. |
| 8 | Thank you, your Honor. |
| 9 | THE COURT:  So, this is a bail application.  So, |
| 10 | please, be seated, and let me hear first from defense counsel. |
| 11 | MS. NEWMAN:  Yes, your Honor. |
| 12 | As I understand it, it is the government that has the |
| 13 | burden here and that they're asking for detention and that I |
| 14 | have advised them of my bail package and they, nonetheless, |
| 15 | have assured me in conversations that it is their position that |
| 16 | there are no conditions that will assure the safety of the |
| 17 | community or Mr. Charles. |
| 18 | THE COURT:  Yeah.  Well, I think they're basing that |
| 19 | it seems like, and Pretrial Services seems to feel the same |
| 20 | way, that unfortunately, Mr. Charles has a substantial record |
| 21 | beginning with an arrest for second degree robbery at age 14, a |
| 22 | youthful offender adjudication on the charge of forcible theft, |
| 23 | armed with a deadly weapon at age 15, a youthful offender |
| 24 | adjudication on the charge of robbery involving use or |
| 25 | threatened use of a dangerous instrument at age 16, all this |

L7MAACHAC                    Conference

followed by four criminal convictions since he became an adult.
In 2018 he was convicted of criminal possession of a firearm.
A year later he was convicted of third degree robbery, plus
criminal sale of a controlled substance, plus second degree
assault.

          I have to say, having nothing to do with this
application per se that when I read a record like that, I
always feel that society has failed in some way this fellow.
This fellow has been engaged it would seem in criminal activity
since a very early age.  I am concerned.  And this does relate
to the bail application, a bail whether he thereby poses a
danger to the community, but I am also concerned, to be frank,
about why he's embarked on this career of criminality and what
can be done to turn it around.

          But let's stick with the bail application for now.

          MS. NEWMAN:  Thank you, your Honor.

          I can address that.  I always like to hear from the
government first but I think your Honor is, part of what the
government is going to assert is exactly what probation, the
Pretrial Services has said, your Honor.  But I think you can
look at it carefully.  This is what you see.  And I have some
facts that I think add to round out what actually happened.

          So, first thing that becomes glaring is from aged 16
to age 23, there's no arrests at all, not even a DUI, nothing.
Mr. Charles has worked.  He's a member of a union, a cement

L7MAACHAC                    Conference

1    union.  He's consistently worked.  So, 2018 we have four

2    arrests.  He is convicted on the same day.  He pleads on the

3    same day and is sentenced on the same day for all four and in

4    total, total, he gets three years.  So, while there's all these

5    allegations, we end up with a case where the judge with

6    complete history and understanding with the prosecutor there,

7    gives him a total of three years.  And today, and that's why

8    we're here today, your Honor, actually, would be his time to be

9    released on parole.

10          So, if we look at it -- and I think exactly, what I

11   have asked my client -- so, what was happening in 2018 because

12   we know from 16 to 23 you were working.  Well, he was laid off.

13   He had a lot of problems, emotional problems that he was going

14   through, personal problems and he has admitted that that was a

15   period where he was smoking more and more marijuana.  It does

16   not excuse it.  But what's also very clear from this record and

17   very important for this Court's consideration is he always

18   appeared in court.

19          THE COURT:  Yes.  I don't think, unless the government

20   tells me otherwise, that they're claiming that he is a flight

21   risk.  I think it's all based on the danger to the community

22   problem.  Let me just see if that's correct.

23          MR. GUTWILLIG:  Yes, your Honor, dangerousness.

24          MS. NEWMAN:  But I also think it's important as to

25   dangerousness and the recognition that he does abide once he is

released for once arrested on conditions to appear and I think

that does have do with it.  But I understand where the Court

was going and thank you.  So, I won't address the flight risk

that much.

So, I think that that's important.  Now, let's look at

the juvenile record.

Let me go back, because on 2018, I also want the Court

to know that he was, because he was smoking, because he was

misbehaving, he was not living with his mother.  Now, why is

that important for the Court's consideration?  Because in my,

who is present -- I am sorry.  Ms. George is here and so, as

well is Mr. Charles' son.  And he is very thankful to the

marshals that they have allowed him to turn around and speak

with his son who is ten-years-old.

So, he was having problems.  He needed -- it doesn't

excuse it.  He pled guilty.  So, we're not saying -- but in any

event, understanding what was happening, his mom through him

out.  Why is that important?  Because part of my bond package

and I am offering his mother as a third-party custodian.  Going

back to that then is something important about the juvenile

offenses.

So, the juvenile offenses when we look at them, what

happened is that he was, the robbery had to do with a temporary

possession of a weapon.  There was an altercation with an

individual who turned -- and others were present -- who turned

1   out to be an off-duty policeman but he never identified

2   himself.  And the altercation was started, according to what I

3   understand that the record would reflect, the officer who then

4   pulled out a gun, hit my client.  My client took the gun.  I

5   have no idea if it was loaded or not.  It wasn't his gun.  And,

6   yes, he went after the police officer, not to fire it.  Took it

7   and then ran away.  So, he never did assault but it was

8   robbery.  He then dropped it a block later.  So, the robbery is

9   based on this temporary possession of the firearm that wasn't

10   his.

11          So, if you were looking at all the charges you could

12   say my God.  But then what does he get?  He gets one to three

13   years.  So, we know that, and at the same time is the other

14   offense is adjudicated.  So, this one to three runs concurrent.

15   And that's the same with all the four offenses that your Honor

16   mentioned.  And I'm not sure.  I think one is on appeal of the

17   four offenses but it doesn't matter at this point.  There would

18   be a technical issue.  It's not as significant.  But I think

19   that's what speaks when we talk about this conviction and we

20   talk about that is he a danger.

21          So, let me offer my package, as well as some of the

22   history and I think that after the Court hears that, the Court

23   will understand why I believe that we have met our burden which

24   is not a very heavy burden of putting forth some evidence to

25   rebut the presumption which we concede is applicable here and

1  that the government's been having a very difficult time to

2  build clear and convincing evidence.

3          So, let me tell you the package.  I am offering three

4  suretors, Ms. George, who is present, his mom.  And he would be

5  living with his mom at the same residence that he's lived his

6  entire life, a residence in the Bronx where she's lived,

7  she's -- 25 years, I guess more than that, 28 years.  She works

8  part-time and the home is a three-bedroom home.  And so, there

9  would be a bedroom, obviously, for her son that was his

10  bedroom.  We are offering her as a third-party custodian.  So,

11  my point when he was misbehaving she had nothing to do with

12  him.

13          But this is also important that juvenile offense there

14  was really no evidence that, my client's involvement.  There

15  are others involved.  When he came home and he told his mom

16  what happened, she took him by the hand and said we're going to

17  do the right thing.  And they went to the police and he told

18  and made a confession, without which there would not have been

19  a conviction.  So, Ms. George knows right from wrong and she

20  would make an excellent third-party custodian because the

21  slightest thing, she is calling up and saying come get him.

22          We're offering GPS, home detention.  Although,

23  Ms. George has paid his union dues so that when he were to come

24  home he would have, his union job is waiting for him but we

25  understand.

1            And so, I've spoken with my client despite the fact

2    that he would like to be able to contribute to the household,

3    obviously, which he always did.  He would not be able to work

4    at this time and --

5            THE COURT:  What about the other two co-signers?  Tell

6    me about them.

7            MS. NEWMAN:  OK.  Then we're also offering his sister

8    with whom he's very close.

9            THE COURT:  What does she do?

10           MS. NEWMAN:  She works in the roofer's union.  She is

11   27-years-old -- excuse me -- 34-years-old.  I apologize.  She's

12   a roofer.  She also lives in the Bronx.  She has two children

13   that she supports.  She gets child support and she earns about

14   $60,000 a year.  She has no record, no bankruptcy.

15           We are also offering his significant other who he's

16   been with for about six years.  Her name is Ashay Russell.

17   Okay.  I pronounced it right.  She is 27.  She works as a

18   juvenile detention counselor.  She's worked there for about

19   three years, and she earns about $48,000 a year.  I believe

20   that she is on her way but she was stuck in traffic.

21           His sister could not get the day off.  But I've a

22   spoken to her twice to confirm this information.  And more

23   importantly, that she would be willing to be a suretor and they

24   are very close.

25           He has six other siblings of which he's close and they

1    all live in the area.  He has always lived in the Bronx.  This

2    is his community.  He has ties to the Bronx.  He has,

3    obviously, as I said, no where to go.  He has worked in the

4    cement union continually until 2018 when he was laid off and

5    then he was offered a job again.

6            Important also, is that he was just about to take his

7    GED when the feds came to execute the writ and that's why he is

8    here.  So, he's ready to take his GED as soon as he can, as

9    soon as COVID allows him to do it.

10           THE COURT:  One other question and then I want to hear

11   from the government.

12           So, if I were to release him in terms of the federal

13   charges, he still has some time to serve on the state charges.

14   It says here in the presentence, in the pretrial report,

15   "conditional release date July 23", tomorrow.

16           MS. NEWMAN:  Right.

17           THE COURT:  But this shows my ignorance of state

18   practice.  Is that an automatic or because his, the expiration

19   date of his sentence could be as late as December 29?

20           MS. NEWMAN:  So, it is my understanding -- and I've

21   had this in many cases.  This is very common -- that the

22   conditional is almost automatic.  He's had no tickets.  There's

23   no reason to believe that would be the reason that he wouldn't.

24   So, he's had no tickets.  He only has a juvenile record.  He

25   doesn't have a lengthy record.  He had the four cases that were

L7MAACHAC                    Conference

1    all concurrent.  So, what he has to do, what happens is that he

2    will go back to the state for a day or two.  They have to sign

3    out.  And so, this is another reason, this is really enough

4    that really, if he doesn't sign out, you know, like complete

5    the paperwork, then he's not placed on parole.  And the time,

6    he would have to max out.  So, all this time that he's here, if

7    he is not released is not, if in fact at the end of the day he

8    either pleads guilty or is convicted at trial, would not unless

9    the Court grants that time to him.  So, it's very important for

10   him that he does get released to the state so he can sign back,

11   sign-in.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

L7MHCha2

1          MS. NEWMAN:  I know that's a problem for the Court,

2     and so I thought of something that might be a little creative.

3     I don't know whether the Court would agree that we grant bond

4     conditionally and not -- he can't be released till all the

5     conditions are met.  So one of the conditions is he has to sign

6     the bond.  He can't -- he will be then, after he signs out,

7     assuming the Court would agree with me, he will be brought

8     back, he can then sign the bond, and then he'll be released.

9          THE COURT:  All right.

10          MS. NEWMAN:  So I circumvented the problem.

11          THE COURT:  That's an interesting thought.

12          All right.  Let me hear from the government.

13          MR. GUTWILLIG:  Yes, your Honor.  So here, and I think

14     there was some discussion of the presumption, the charges here

15     are a (b)(1)(A) narcotics conspiracy and a 924(c).  The

16     presumption, the burden, is on the defense to show by clear and

17     convincing evidence that they can overcome the dangerous

18     proposition from the presumption here.  They have not done that

19     or really, in the government's view, come close to doing that.

20          We can start with the nature and circumstances of the

21     defendant.  Your Honor, I'm happy to stand or talk into the

22     microphone as --

23          THE COURT:  No, no, that's fine.  But let me ask you

24     this:  Counsel makes the point that after some early troubles

25     when he was still quite young, he got a responsible job, he

L7MHCha2

became a union member, and it was only when the financial

hardships of the pandemic put him in economic distress that he

resorted to activity that led to his guilty plea.  So her

argument, in part, is that he really isn't a danger to the

community because he had grown out of his teenage troubles.  He

was well on his way to becoming a responsible citizen.  Yes,

that doesn't excuse his resorting to criminality when pressures

arose.  Now, I'm a little concerned about the timing there

because, as near as I can tell, the events involving the

various problems that occurred in 2018, 2019 were before the

pandemic.

          MS. NEWMAN:  Yes.  I'm sorry, your Honor, if you

misunderstood.  I never meant it -- he had other problems.  He

was laid off.  Let me clarify for the record, if I may, your

Honor.  I'm sorry to interrupt.

          THE COURT:  Yes, go ahead.

          MS. NEWMAN:  He was laid off having nothing to do with

his work, but there was no work for what he was doing.  That

was the first time ever that he was laid off as opposed to come

back next week.  And he had some other issues, personal issues,

pressures about supporting his son.  None of which can be

excused.  I'm just saying what was going on in his life because

it's clear to anybody looking at the record, what happened in

2018?  Everything was going great in your life, and so what

happened in 2018?  And what happened was all of a sudden for

L7MHCha2

1   the first time he didn't really have a steady job.  He still

2   had to support and, you know, obligations.  He began to, as I

3   said, smoke marijuana, he began to hang out with others, and

4   that's when his mom said you're not going to be here because

5   I'm not going to support this behavior and noting that he was

6   not acting himself.

7           We also have to consider now, your Honor, he's been in

8   jail for three years.  He's three years older.  He's,

9   obviously, not on drugs.  He's completely different.  His

10  mindset is different.  His values are different.  I think we've

11  all changed as a result of COVID.  He's certainly changed as a

12  result of being incarcerated during COVID.  I mean, that's --

13  it's affected everybody's mind and how they view family

14  differently.

15          So if I was unclear, I apologize to the Court, but it

16  has --

17          THE COURT:  Has he been vaccinated?

18          MS. NEWMAN:  Excuse me?

19          THE COURT:  Has he been vaccinated?

20          MS. NEWMAN:  No, he has not been offered a vaccine.

21          THE COURT:  He has not been offered it?

22          (Counsel conferred with defendant)

23          MS. NEWMAN:  OK.  He said they did offer it once at

24  state.  They didn't offer it to him because he was in

25  quarantine.  So they wouldn't -- they don't go near you if

L7MHCha2

1    you're in quarantine.  Because I've asked others in Essex,

2    other clients now who are in Essex, and they haven't had a

3    vaccine being --

4           THE COURT:  Where is he being held right now?

5           MS. NEWMAN:  In Essex.  In New Jersey, in Essex

6    County.

7           THE COURT:  And is it not available there now?

8           MS. NEWMAN:  I'm not sure whether if I asked it

9    wouldn't be available.  He just hasn't been offered it.  As I

10    was explaining, it's quite ironic, because for me to go into

11    Essex and visit, I have to show my vaccination card.

12           THE COURT:  The reason I'm asking that is in these

13    unusual times, I wonder whether that's not a factor that I need

14    to consider in terms of danger to the community.

15           MS. NEWMAN:  It was on my list, and I forgot to

16    mention it.  Well, I think, no, I think the reverse.  I think

17    his right to get a vaccine and to go when he's home and to be

18    vaccinated is an indication --

19           THE COURT:  Well, are you saying, because I'm not

20    totally sure whether I can order that as a -- maybe I can --

21    but you're saying he would consent, as one of the conditions of

22    release, that he would be vaccinated within a week of his

23    release?

24           MS. NEWMAN:  Yes.  And they're readily available as

25    the Court -- yes, and we discussed it.  It was on my list --

L7MHCha2

|     |     |
| --- | --- |
| 1   | THE COURT:  All right. |
| 2   | MS. NEWMAN:  -- because it's very important for him |

         MS. NEWMAN:  -- because it's very important for him
because of his mother, for everybody, not only for himself,
but, obviously, for his mother.

         THE COURT:  Yes, all right.  Back to the --

         MS. NEWMAN:  Thank you.

         THE COURT:  Thank you.

         MR. GUTWILLIG:  So, your Honor, we've charged 13
defendants in this indictment that was unsealed today.  You
asked me at a previous conference to place one of the
defendants into context.  This defendant is one of the leaders
of the crew, along with Israel Garcia.  Those are the two names
at the top of the indictment, Israel Garcia and Jevaun Charles.
Everyone else is listed alphabetically.  Mr. Charles is alleged
to be a leader of this crew, to be involved in drug sales, to
be engaged in back-and-forth retaliatory violence with other
drug crews.  And there is more than ample evidence from all of
this.  They're from multiple social media accounts on which we
conducted search warrants.

         THE COURT:  I'm assuming the government has strong
evidence, but these events all occurred before his
incarceration, right?

         MR. GUTWILLIG:  Well, yes, your Honor.  I think the
carjacking -- so let's just go to the conviction and the most
recent arrest for which he's just been released.  Certainly, he

L7MHCha2

couldn't have been a danger to the community while he was in

prison because he was in prison because he was a danger to the

community.  The arrest that we're talking about and the

conviction for January 2019 when he was arrested and charged

with robbery in the first degree, attempted gang assault in the

first degree, and criminal possession of a firearm involved an

incident where he and other members of the crew opened up a

door to a car, and the defendant hit the victim in the head

with a gun repeatedly.  When he was in prison for that, there

are multiple jail calls in that year of 2019 where he is

talking about the crew's activity and what the government would

submit is coded language about selling drugs with other members

of the crew.  There is also a recorded call which was picked up

on a Title III intercept in which he is discussing a recent

shooting with the crew --

        THE COURT:  This is while he's in jail?

        MR. GUTWILLIG:  While he's in jail.

        -- with the crew, this crew, and a rival crew, talking

about who was there and what happened.

        So, respectfully, to say that he hasn't committed any

further crimes in the past few years, accurate because he

hasn't been able to.  What he did immediately prior to that was

a violent carjacking which involved a gun, and while he was in

jail, he was talking about drug sales.  So the dangerousness is

not, in the government's view, some sort of poor behavior due

L7MHCha2

1   to smoking marijuana or something like that, it was a violent

2   course of conduct.  And that dovetails because that incident

3   involved other members of the crew, as did later retaliatory

4   violence.  It dovetails with the nature and circumstances, the

5   criminal history here, and the fact that there are multiple

6   witnesses who will call him one of the leaders of this crew

7   which sold a significant amount of crack and also engaged in

8   acts of violence and back and forth.

9         To the point of bail conditions, as your Honor knows,

10  in this case the government has agreed with certain proposed

11  bail packages.  There's a good reason why we are not doing that

12  here, and it's because of all the people on this indictment,

13  Mr. Charles along with Mr. Garcia are, in the government's

14  view, the most culpable and the most dangerous, and I think the

15  criminal history that we've been through today --

16        THE COURT:  All you're saying is relevant, but I want

17  to make a distinction.  The weight of the evidence and his

18  leadership role would be most relevant if you were asserting

19  that he was a flight risk because he would face, if convicted,

20  presumably among the highest penalties of those in the case.

21        MR. GUTWILLIG:  Certainly.

22        THE COURT:  As to danger to the community, I think

23  it's still relevant, but I think it's not quite the same.  I'm

24  more troubled, and I want to hear from defense counsel again,

25  if he's busy while in jail figuring out how to go on with his

L7MHCha2

1  crew, or whatever, that certainly suggests a danger to the

2  community.  What about that?

3          MS. NEWMAN:  Thank you, your Honor.  Of course, I

4  don't have the discovery, so we're going -- but I will note

5  what the government said, and I haven't listened to many tapes,

6  as the government's conceded that they have listened to these

7  calls in what, according to the government would state, is

8  coded language, so it's the government's interpretation of what

9  was said.  Now, it may be well off, and I understand that we're

10  here on bail and there's presumptions, but when we're talking

11  about the weight of the evidence and we're talking about a

12  concern about coded language that we don't have, then I think

13  that one has to say it may not be what the government is

14  interpreting it to be.

15          THE COURT:  Let me ask the government.  Give me an

16  example.

17          MR. GUTWILLIG:  I'm happy to provide an example, and

18  this may not be a verbatim response.  But, for example, and

19  I'll just read it here.  In May of 2019, one of the

20  coconspirators tells Mr. Charles:  "We've got mad folks out

21  there.  Boy Kenny, Boy Scout Mikey, they're out there running

22  it.  Tega and Shakur, Ken still doing whatever he's doing."

23  And to this -- so those are identified as aliases of members of

24  the crew -- Mr. Charles responds:  "By the time this shit be

25  done, we're not seeing the bread we supposed to be seeing."

L7MHCha2

1          Not a lot of ambiguity in terms of "bread."

2          THE COURT:  Yes, what about that, Ms. Newman?

3          MS. NEWMAN:  OK.  So, of course, I haven't listened to

4     it, but it does appear that a lot of that is what somebody is

5     giving as what's outside.  It kind of reminds me of whether

6     there is a conversation to take action or it's a conversation

7     of which I'm going to use the word of gossip.  Maybe that's too

8     minimalizing by use of the word "gossip," but is it simply

9     repeating what's happening outside?  And while the government

10    may look at that and say, why are they telling him?  That

11    doesn't mean he's the danger or that he's in any way directing

12    anything as opposed to listening to what's happening outside.

13          I can say, as I've asked Mr. Charles, he has -- he's

14    not a member of a gang.  He doesn't have any tattoos.  He's not

15    a Blood or a Crip or any other of the other gangs that we hear

16    every day.  So when they say a leader of a crew, what I have

17    seen in other cases, it's just that it's somebody who the

18    others talk about more often for whatever reason.  He may not

19    be a leader in the sense of directing is what I'm saying, and

20    that's the distinction.  And if there is another condition that

21    this Court wants to impose that would be even stricter, I'm

22    open to hearing it, but I'm open because what has to be found

23    is not -- it has to be no condition, no combination of

24    conditions.

25          THE COURT:  You're asking, what I thought I heard you

L7MHCha2

```
1    say before, among other things, home confinement, yes?

2              MS. NEWMAN:  That's right.

3              THE COURT:  With his mother?

4              MS. NEWMAN:  Right.

5              THE COURT:  So let me ask the government, and assuming

6    he's electronically monitored and the whole business, how's he

7    going to be in a position to personally assault anyone?  The

8    most that could be said is he would be in contact with his

9    former buddies, and I don't mean to minimize that.  But it

10   sounds like they're -- at least as of 2019, they were perfectly

11   happy to move onwards even with him in prison.

12             MR. GUTWILLIG:  Your Honor, to address a few things

13   that defense counsel has just said, this is a crew.  It is a

14   gang.  It is a set of the Young Gunnaz, YG, gang that operates

15   on 130th and 184th Street and Morris.  I cited one example of a

16   prison call.  There are others where they talk about the drug

17   trafficking organization expanding locations and selling

18   faster, drug supplies, amounts sold.  And I mean that not only

19   in terms of the weight of the evidence but also this isn't some

20   sort of idle chatter.  Mr. Charles' social media accounts are

21   littered with examples of his membership and with other members

22   of the crew and postings about 184th and YGs and crimes and

23   other indicators of being in the crew.

24             Respectfully, location monitoring will only tell us

25   after it happens if he goes and hits somebody again or shoots
```

L7MHCha2

1   somebody.  I think the argument that he couldn't be dangerous

2   on home confinement, I mean, certainly if he stayed in his home

3   with his mother the whole time, that would be true of any

4   defendant, and -- or any violent defendant who's not using

5   electronic means or otherwise.  But here we have examples of

6   him in prison for a violent offense, continuing to talk about

7   and direct drug activity.  So the idea that he's not a danger

8   and that these drugs aren't dangerous and that the crew isn't

9   dangerous, I just -- the government just can't agree with that.

10          THE COURT:  All right.  Anything further from defense?

11          MS. NEWMAN:  Very quickly, your Honor.  As I

12   understood it, there are 13 people who've been arrested.  I

13   understood that to be the crew.  So whether they're in jail or

14   out on bond, it's true in any case.  And the statistics -- and

15   we just had a recent CLE on this.  So maybe it's just in my

16   mind now -- the statistics demonstrate that people on home

17   detention do not statistically reoffend while on bond.  That

18   people on bond are not running away, cutting their bracelets.

19   That it's few and far between that we see this or are a danger

20   running around.

21          We know who the third-party custodian -- and I offer,

22   if the Court would like, to question Ms. George further on how

23   she -- why she is so confident, because I've questioned her,

24   that she, in fact, will be sure that her son abides by all

25   conditions of bond, which, as she knows, he cannot leave the

L7MHCha2

1    house.  So I think that whatever happened, if he committed

2    violence, not while in jail; and social media, not while in

3    jail.

4            THE COURT:  Well, I'm pausing because I do find this a

5    close case.  Of course, it's a presumption case and that has to

6    be taken account of, but on the other hand, what we're talking

7    about ultimately is a constitutional right, and that can and

8    should color the whole analysis as well.

9            I think that in the end what is most troubling to the

10   Court are those telephone conversations.  That seems

11   inconsistent with the defense view that this was a person that

12   has basically become a law-abiding citizen, then he got laid

13   off, and so he resorted to crime.  But the government says, no,

14   not only did he resort to crime, he became a leader.  But more

15   or equally relevantly, even while in prison he was still in

16   contact with his fellow crooks, and I think that is powerful

17   evidence that he would continue to be a danger to the community

18   even if he were fully home confined, as of course is one of the

19   suggested conditions.

20           So I find it a close matter, but in the end, I'm going

21   to deny the application.

22           So that concludes this proceeding.

23           (Adjourned)

24

25