UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
UNITED STATES OF AMERICA

                                                21 cr 412 (JSR)

-against-


ALVIN FERNANDEZ,
                                Defendant.
--------------------------------------------------------x


# SENTENCING MEMORANDUM


Jeffrey G. Pittell
**MAHER & PITTELL, LLP**
*Attorneys for Defendant*
42-40 Bell Blvd., Ste. 302
Bayside, New York 11361
(516) 829-2299

# TABLE OF CONTENTS

**Item**                                                               **Page**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

PERSONAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

CURRENT LIFE FOLLOWING HIS ARREST . . . . . . . . . . . . . . . . . . . . . . . .  6

ACCEPTANCE OF RESPONSIBILITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

THE IMPACT OF THE PANDEMIC UPON INMATES. . . . . . . . . . . . . . . . .  16

SENTENCES UPON CODEFENDANTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

THE CALCULATION OF ALVIN'S CRIMINAL HISTORY CATEGORY . .  20

EQUAL ACT -- ONE FOR ONE DRUG WEIGHT.. . . . . . . . . . . . . . . . . . . . .  21

REQUESTED SENTENCE AND SUPPORTING REASONS .. . . . . . . . . . . . .  21

CONCLUSION .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

# INTRODUCTION

This Sentencing Memorandum is submitted on behalf of Alvin Fernandez.

For the reasons stated herein, we respectfully request the Court impose a sentence of time served.

Although this Memorandum asserts forth multiple reasons in support of the requested sentence of time served, we point to two compelling factors.

First, this is a case where, at the time of his arrest, Alvin had already "walked away" from the Bronx and left behind the drug trafficking conspiracy described in the Indictment and PSR. During December 2020, approximately one and one half years before the Indictment was unsealed, Alvin moved more than one hundred miles away to Peckville, Pennsylvania. He still lives there with his wife and children. As such, this is not a case where someone was arrested while currently engaged in the course of ongoing criminal conduct. Instead, it is an instance where Alvin's past has "come back to haunt him."

Second, following his arrest, Alvin spent two and one half months in jail until he was released on bond. Thereafter, he spent two more months on home confinement. As detailed herein, the sentence Alvin has already served is consistent with sentences imposed upon similarly situated codefendants.

Wherefore, we respectfully request the Court impose a sentence of time served.

## PERSONAL BACKGROUND

Alvin Fernandez is 33 years old.  He was born and, until recently, has always lived in the Bronx.

### Childhood and Young Adulthood

Growing up Alvin was raised by his mother.  During his early childhood, Alvin's father was "barely around."  He never provided financial support to the family.  When Alvin was eleven years old, his father "disappeared" and Alvin did not see him for a decade.

Alvin lived with mother, and three older siblings, in the Fordham area of the Bronx.  His family "scraped by" on his mother's income which consisted of either minimum wage -- earned at factory jobs -- or public assistance.  At times, there was not enough money for the family to eat every day.  New clothes were a luxury which rarely happened.  Most of Alvin's clothes were worn out "hand me downs."

Alvin lived in a "tough" neighborhood.  Every day, he saw people selling drugs on the street.  Witnessing crimes, such as robberies, gun possession, assaults or cars being stolen, were common occurrences.

When Alvin was in his teens, his mother moved to the Dominican Republic. She left him in the care of his two older brothers, Domingo and Richard (who were in their early 20's).  However, his brothers were not suitable parental role models.  At

2

that point in their lives, they were "running wild" selling drugs or engaging in other crimes.[1]  At various times, they were going in and out of jail.  Needless to say, they did not watch over Alvin.  They did not prepare meals for him.  They did not make sure he went to school.  They left him to fend for himself.

Against this backdrop, it is not surprising that Alvin dropped out of school.  He hung out with friends and began smoking marijuana.  In order to support himself, he resorted to selling drugs on the street.  Inevitably, being on the street every day led to Alvin getting arrested.  When Alvin was age seventeen through twenty-one, he was arrested several times for drug related charges.

By the time Alvin was in his early twenties, his life was heading downhill.  He did not have a steady job.  He was a high school drop out.  He had been in and out of jail.

During this time, Alvin's father resurfaced.  Previously, Alvin had heard rumors in the neighborhood that his father was an alcoholic and homeless.  He was told his father had been seen sleeping on roofs and in alleys by garbage bins.  Even though his father had not been a part of his life, nonetheless, learning of this circumstance was heart breaking for Alvin.  As such, he and Domingo tracked down

---

[1]

Alvin's brothers have since moved on from this lifestyle. As noted in the PSR, Domingo is a music engineer and Richard is a chef.

and located their father.  After they found him, they got him into an alcohol treatment program, applied for him to receive public assistance and secured a NYCHA apartment for him.  Thereafter, they lived with him to ensure he did not relapse.

During this period, Alvin was involved in a relationship with Cecily Smith. Eventually, Alvin moved in with Ms. Smith who had given birth to their daughter A.F. (now age 10).

## Involvement in the Offense

Seeing what happened to his father, Alvin had a moment of self-introspection. He realized that-- if he continued selling drugs -- then his father's life could become a foreshadow of his own his future.  As such, this became a catalyst for Alvin to stop selling drugs.  Thereafter, for several years Alvin stopped selling drugs.  During this period, he worked at warehouses and factories (earning a minimum wage of $10 per hour).  Sometimes, he traveled as far as Pennsylvania to work.

Alvin candidly acknowledges that, due to his not earning enough money to support his family, "before he knew it," he foolishly slipped back into selling drugs.

**Family Life**

During 2020, Alvin's relationship with Ms. Smith began to deteriorate to the point where a break up was inevitable.

Alvin is currently involved in a committed relationship with Latequa Suarez. Alvin and Latequa have known each other since they were in middle school. When they were in their teens, they dated for a few years. However, they eventually separated (amicably) and went their separate ways. After the separated, they both became involved in other relationships (which also ended with break ups). As noted above, Alvin became involved with Ms. Smith and had a daughter with her. Latequa became involved in a relationship and had two children, a son (C.B., age 15) and a daughter (H.B., age 9). Also, she had moved out of the Bronx. She moved, with her children, to Peckville, Pennsylvania (which is near Scranton).

Even though Alvin and Latequa had ended their relationship many years ago, they still followed each other social media.

When's Alvin's relationship with Ms. Smith deteriorated to point of inevitable separation, he reconnected with Latequa. He initially contacted her by sending her messages via social media. Eventually, this commination led to their rekindling their relationship. During December 2020, Alvin moved out of the Bronx and began living in Peckville with Latequa and her children.

5

Now one and one-half years later, Alvin realizes is blessed as relationship wiht Latequa has led to his "escaping" the pitfalls of life in the Bronx.  Equally as important, he continues to be in a committed relationship with Latequa.  They still live together and consider themselves as husband and wife.  Alvin views her children as his own.

## CURRENT LIFE FOLLOWING HIS ARREST

The Indictment was unsealed in this case on June 22, 2021.  At that time, Alvin had been living in Pennsylvania for approximately one and one half years.   He had disassociated himself from the drug dealing and other "goings on" in the Bronx.

Following the unsealing of the indictment, the case agents never traveled to Pennsylvania to arrest Alvin.  During late July 2021, he was traveling in Oregon with Latequa.  While there, he was stopped by an Oregon police officer which resulted in his being arrested on the warrant which had been issued (with the filing of the Indictment) in this case.

Following his arrest in Oregon, Alvin was detained.  Thereafter, it took two months, until September 30, 2021, for him to be transferred and presented in the Southern District of New York.

When he was presented before the Duty Magistrate, bail was granted subject to strict conditions which included home incarceration and location monitoring. In addition, Alvin remained in custody, for another two weeks, until the bond was signed by all the suretors.

Following his release on bond, Alvin remained on home incarceration for two months.   On December 17, 2021, this condition was modified to home detention in order to provide Alvin's supervising Pretrial Services Officer with discretion to allow Alvin to leave his home to seek employment or attend to personal chores.

Since them, Alvin has demonstrated he is committed to being gainfully employed, taking care of his family and living a law-abiding life.   Notably, the following events have occurred in his life:

- He has been steadily employed
- He has been a paternal presence in the lives of his children
- He has been compliant with pretrial supervision

### Steady Employment

During the course of the Pandemic, including while he was on home incarceration, Alvin realized there was a strong need for delivery services for companies such as *Amazon*, *Walmart* and *Target* whose online business was increasing.   As such, he and Latequa started a business where they provided

7

independent truck delivery services to these companies.  However, soon after the business commenced operations, due to a back injury, Latequa could no longer assist Alvin in operating it.  Due to his not being able to run the business on his own, Alvin sought other employment.

Thereafter, Alvin began working at a *KFC* (also know as *Kentucky Fried Chicken*) fast food restaurant as a fry cook.

**Alvin frying chicken at *KFC***



Due to Alvin's diligence at work, the manager of the restaurant, Matthew Bullock, has promoted Alvin to being a night shift supervisor.   Alvin's responsibilities include supervising other workers and closing the restaurant every night.  Moreover, Mr. Bullock -- who is leaving for another position -- is currently training Alvin to take over his job and become the new restaurant manager.

Mr. Bullock has written a letter which extolls Alvin's work ethic and his ability to interact with both customers and employees.  The full text of his letter is on the following page:

June 25,2022

Kentukey Fried Chicken
531 Scranton Carbondale Hwy
Scranton Pa , 18403

It's To Whom it may concern,

I Matthew Bullock the RGM to Kentucky Fried Chicken would like to send this letter to the appropriate personal in regards to Mr. Alvin Fernandez. Mr. Fernandez came into my Employ on May 07, 2022. He came with a humble heart and eager to work. From the very start he was a fast learner and has grown with in the company. Alvin has the respect of his Peers and fellow team members. Alvin has taught the team while on site in his daily duties learned to cook at Kentucky fried chicken and also has become the top performer in customer service within the company.

Alvin has since his employment with the company, Become a shift supervisor and has impeccable standards for customer service and company standards. He has become a true leader and has developed a way of speaking to the team as well as guests that is amazing. He has made an amazing manager and I am pushing him to grow and reach his full potential with in the company. Alvin since his shift supervisor roll and training, is now in training to take over my position as RGM here in Eynon pa. Under my care and guidance Alvin has made amazing steps along with his impeccable performance along the way to running this facility on his own. His determination impeccable performance that he has maintained from the first day of employment until now will continue as he continues to grow with in the company and his future is very bright.

If you would like to ask me any questions or would like clarification on a subject matter please feel free to contact me on my cell at                    or you may call the store at 570-876-1404 and there is always email as well..                    and address to myself Matthew Bullock . I would like to thank you for your time and I would like to say how much I myself admire this man and have learned so much from him as well as he has learned from me.

Thank you
Matthew Bullock

**A Paternal Presence**

Alvin is determined not to "follow in his father's footsteps" and be an absentee parent.

Even though he now lives in Pennsylvania, he speaks with his daughter, A.F. almost daily.  In addition, she regularly stays at his home, in Pennsylvania, during weekend visits.

Moreover, even though he is not the biological father to Latequa's children, Alvin loves them as if they are his own.

In anticipation of Alvin's sentence, Latequa and her son, C.B., have written letters on his behalf.

In her letter, Latequa describes how Alvin has become an integral part of the daily lives of her children and her life as well.  Similarly, C.B. writes how Alvin has been a "wonderful stepfather" to him and his sister.

Full copies of their letters are on the following page:

**Letter to the Court from Latequa**

To whom it may concern

Alvin Fernandez is a major help to our family he works many hours to support my 10 year old daughter my 15 year old son who is in a wheelchair and myself he also pays all the bills that needs to be taken care of at home he also does the outside work such as mowing the lawn cleaning the backyard cleaning the pool taking out the garbage and walking the dogs. Alvin help with the most important part at our home which is helping my son in a out of the car taking him to appointments with me so he can help transfer him because I am unable to do so he helps him in and out of the shower and whatever needs for him.

Alvin and I have been living with each other for two years now but I have known him for over 20 years and I have seen the growth in him. He has changed from a boy who didn't know where he was going in life into a man who knows what he wants we have been working on our business which we had to stop because of my back injuries and not being able to drive for long hours and his curfew but he has plans on a future for not only himself but our family. Alvin still didn't let not being able to go Forward with our business stop him from taking care of his family. Alvin started working at KFC to support himself and us. With his ambition to making more money to be able to support us and be able to save he in 3 months of working there is now training to run his own store and become the lead manager.

Alvin is also a great father to his daughter of 9 years old he picks her up every other weekend and spend many hour with her helping her practice on her reading and math.The father daughter bond that they have is Beautiful. She tells me every time how she miss being with her father and she prays every day that she don't have to not see her father for so long again.

Alvin is a loving caring father step father and Spouse he is the support team for all without him here we don't know what we will do as far as how our bills will get paid or things will be taken care of at home.

Sincerely



**Letter to the Court from C.B.**

I [C.B.] is writing this letter to explain what a wonderful step father Alvin is to me. He helps me with my every day living. Before Alvin go's to work he wakes me up to ask if I need anything he helps me in a shower and out to and from my appointments. Alvin has been the biggest help to me my mother and sister. A few years ago my mother hurts herself at work is isn't able to do much for me like she use to but now that Alvin is here he helps with everything and I don't have to worry any more. Alvin is the best.

Thank you

C.B.

**Compliance with Pretrial Supervision**

As noted above, when he was initially released on bond, Alvin was placed on home incarceration. For the following two months, he was confined to his residence and not permitted to leave. Thereafter, it was modified to home detention (meaning that Pretrial Services had discretion to allow him to leave for brief periods to seek employment, shop for groceries or tend to other life necessities).

It is our understanding that Alvin was complaint with these conditions as well as his other bond conditions. Recently, in order to accommodate his employment obligations, for the trucking business and at *KFC*, the home detention condition has been removed and replaced with a curfew (currently 11 p.m. to 6 a.m.). It is our understanding that Alvin has been compliant with the curfew. In addition to being compliant with the terms of his pretrial supervision, Alvin has not engaged in any criminal conduct.

**ACCEPTANCE OF RESPONSIBILITY**

Alvin is deeply remorseful and fully accepts responsibility for his offense conduct. In addition to his guilty plea, plea allocution and statement to the interviewing Probation Officer, as a further demonstration of his remorse and acceptance of responsibility, he has written the following letter to the Court:

14

i Alvin Fernandez want to write this letter to whom it may concern I want to take this time to say I am a good man I understand I have done things that I know is not morally right but I want to take this time to take full responsibility of what I have done now things that I have done in my past. that is not who I am today today I am a man who has a family and wants to do great things in this world I love putting smiles on peoples faces strangers family anyone I come across I work hard and I cherish the time I spent with my family my love ones and friends I made a promise to my love ones two years and a half ago that I will never be the person I was during the time when I was lost I dug myself out that dark hole I made a choice to do good and change my life and I've been doing it ever since

Sincerely Alvin Fernandez

## THE IMPACT OF THE PANDEMIC UPON INMATES

We trust that, during the past two and one-half years, Your Honor has been inundated with motions for bail and sentence reductions (also called motions for compassionate release) predicated upon the horrific conditions which existed, and continue to exist, in federal prisons.

When the Pandemic started, the Federal Bureau of Prisons (the "BOP") implemented so-called modified operations in response to it. The BOP heralded these modified operations as its "COVID-19 Action Plan."[2]  However, the impact of these modified operations was punitive.  All visits (legal and family) were terminated. Telephone and email contact were curtailed.  All recreation, education and training programs were discontinued.  Inmates were "quarantined" (i.e., - locked up) in their cells, or dorms, for twenty-fours per day for days, weeks, or even months at a time. Inmates were served cold, or even frozen, meals.

During the two and one-half months that he was in custody, Alvin reports that, at various times, he endured these types of conditions.

Now, almost two and one-half years have passed since the onset of the Pandemic.  For people who are not incarcerated, life has evolved back to a semblance

---

[2]

https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp

of normalcy.  Children are back in school attending classes in person.  Restaurants and businesses are open.  There are no longer waiting lines, or social distancing, in supermarkets and drug stores.  Mask mandates have been lifted.

However, for BOP inmates, life has not fully gone back to "normal."  It appears that the BOP has now incorporated portions of its Covid Action Plan into its standard operating protocol.  Inmates report: 1) they still only have limited access to recreation and programming; 2) family visitation is still very limited; and 3) they are regularly locked into their cells on weekends (from Friday night to Monday morning) due to staffing shortages.  In addition, incidents at a single jail -- anywhere in the U.S. -- can become a basis to locks down every single jail in the BOP system.  For example, during January 2022, an incident in a Texas jail became a reason to lock down every BOP jail throughout the U.S.[3]

Based upon the foregoing, even though the Pandemic has waned, the BOP has apparently decided that, to some degree, locking down inmates, limiting visitation and reducing programming are here to stay.  As such, there is a likelihood that, if incarcerated, Alvin will be forced to serve his sentence under these circumstances.

---

[3]
https://www.cnn.com/2022/01/31/us/federal-prison-lockdowns/index.html

## SENTENCES UPON CODEFENDANTS

As set forth in the Plea Agreement and PSR, Alvin's Total Offense Level ("TOL") is 31.  Based upon our review of the docket, it appears there are four (sentenced) co-defendants who, like Alvin, have pled guilty to a lesser included conspiracy offense -- 21 U.S.C. §§846, 841(b)(1)(C) -- which does not require imposition of a statutory mandatory minimum sentence and have the same TOL.

These four defendants, like Alvin, pled guilty pursuant to Plea Agreements where the parties stipulated the applicable U.S.S.G. drug quantity was 2.8 kg to 8.4 kg of crack cocaine which corresponds to a base offense level of 34 which, with acceptance of responsibility, results in a TOL of 31.

For the Court's reference, a table specifying these co-defendants is as follows:

| Def. | USSG Drug Quantity/ Base Offense Level | Total Offense Level ("TOL") | CHC | Advisory Guideline Range (mos) | Sentence |
|---|---|---|---|---|---|
| Beltre | 2.8 to 8.4 kg of crack cocaine / USSG Base Offense Level 34 | 31 | I | 108-135 | 2 mos |
| Rivera | same | 31 | I | 108-135 | 4 mos |
| Silva, M | same | 31 | I | 108-135 | time served |
| Culbert | same | 33 Due to 2 level gun possession enhancement | I | 135-168 | 8 mos |

Alvin has the same TOL as Beltre, Rivera and Silva.  As described in the PSR, his offense conduct is similar.  He engaged in street sales of personal use quantities of crack cocaine.  (PSR ¶¶25,26,28,29).  Like these co-defendants (except for Culbert), he did not possess a gun.  Like these co-defendants, he was not involved in any acts of violence attributed to some of the other co-defendants named in the Indictment.

19

## THE CALCULATION OF ALVIN'S CRIMINAL HISTORY CATEGORY

The PSR calculates that Alvin is in Criminal History Category ("CHC") II. However, we contend this calculation overstates his criminal history.

This calculation is based upon Alvin having three misdemeanor convictions for which he was adjudicated a youthful offender. (PSR ¶¶ 62,63,64). These offenses occurred fifteen years ago (during 2007) when Alvin was age seventeen and eighteen.

One offense was for menacing for which Alvin was sentenced to 45 days imprisonment. The other two offenses were for trespass and jumping a subway turnstile. Generally, it is common practice, in New York City criminal courts for trespass and fare-beating offenses to be resolved by a plea to a disorderly conduct with a sentence of time served. If this had occurred, then these two offenses would not have been included in the calculation of Alvin's CHC. *See*, U.S.S.G. §4A1.2(c)(1). However, it appears that, in this instance, even though he pled guilty to the menacing charge (a misdemeanor) and agreed to a 45 day sentence, these two charges were simultaneous resolved by guilty pleas to misdemeanor offenses with concurrent 45 day sentences.

Based upon this circumstance, we submit the inclusion of these types of offenses-- which occurred more than fifteen years ago -- in the calculation of Alvin's CHC results in an overstatement of his CHC.

20

## EQUAL ACT -- ONE FOR ONE DRUG WEIGHT

We note that, in all of the submissions relating to the above referenced co-defendants Beltre, Rivera and Silva, M., both defense counsel and the Government urge the Court to give consideration to the potential impact the EQUAL Act will have upon the crack cocaine guidelines.

As noted in these submissions, if the EQUAL Act were to apply, then as with the co-defendants, Alvin's TOL would be 27.  Based upon CHC II, this TOL corresponds to an advisory Sentencing Guideline range of 78-97 months.

## REQUESTED SENTENCE AND SUPPORTING REASONS

As noted herein, following his arrest, Alvin was in jail for two and one-half months before he was released on bond.  Thereafter, he was on home incarceration for another two months.  In light of this circumstance, coupled with the reasons set forth herein, we respectfully request the Court sentence Alvin to a term of **time served** (the "Requested Sentence").  We contend this sentence is fair and just based upon a combination of following reasons:

***First,*** 18 U.S.C. §3553(a)(1) requires a sentencing to consider the "history and characteristics of the defendant."  As such, we urge the Court to consider Alvin's

21

personal background and especially how he has been living a productive, law abiding life following his arrest and release on bond.

***Second,*** 18 U.S.C. §3553(a)(6) requires a sentencing court to consider the need to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

In the matter at bar, there are at least three co-defendants -- Beltre, Rivera and Silva, M. -- whose conduct within the conspiracy and criminal history category are comparable with Alvin. These defendants were sentenced to terms ranging from time served to four months. In addition, a fourth defendant, Culbert, who has the same drug quantity attributable to him, was sentenced to a term of eight months. However, his conduct was more serious as it -- unlike Alvin -- involved possession of a gun.

Based upon the foregoing, we submit that a sentence of time served (wherein Alvin was in jail for two and one-half months and on home incarceration for an additional two months) will not result in him being subjected to a disparate sentence compared to these other co-defendants.

***Third***, 18 U.S.C. §3553(a)(4)(A) requires a sentencing court to take the advisory Sentencing Guidelines into consideration. We trust the Court recognizes the Sentencing Guidelines are merely advisory. Fifteen years ago, the Supreme Court recognized the Sentencing Guidelines only "reflect a rough approximation of

sentences that might achieve §3453(a)'s objectives." *Rita v. U.S.*, 127 S.Ct. 2456, 2464 (2007).  As such, we submit that a downward variance -- to sentence of time served -- will not conflict with §3553(a)(4).

**Fourth,** we submit the Requested Sentence represents a reasonable consideration of the factors under 18 U.S.C. §3553(a)(2)(B) & (C) which require a sentencing court to consider the need "to afford adequate deterrence to criminal conduct" and to consider the need "to protect the public from further crimes of the defendant."

Ever since he moved out of the Bronx, and to Pennsylvania, Alvin has demonstrated there is no concern about protecting the public from further crimes nor is there a need to incarcerate him for purposes of specific deference.  In addition, nothing has occurred in Alvin's life which suggest he is a violent person or presents a threat of violence.

**Fifth,** 18 U.S.C. §3553(a)(2)(D), requires a sentencing court to consider "the need for the sentence imposed . . . to provide the defendant with needed educational or vocational training . . . or other correctional treatment in the most effective manner."

As described herein, Alvin has demonstrated he is willing to work in factories and warehouses earning a minimum wage.  Recently, he has shown initiative by

23

starting up a business.  Thereafter, when the business could not continue, Alvin started working a *KFC* restaurant where he has already been promoted and is being trained for another promotion.  As such, there is no apparent need to incarcerate him for purposes of vocational training purposes.  Moreover, in light of the fact this country is experiencing a labor shortage, in seems counterintuitive to incarcerate a productive contributor to the workforce.

*Sixth,* we urge the Court to consider that Alvin is remorseful and fully accepts responsibility for his actions.  He entered into a timely guilty plea, he allocuted to the Court, he acknowledged his guilt to the interviewing Probation Officer and he has written a letter to the Court.

*Seventh,* we submit the Requested Sentence represents a reasonable consideration of the factor under 18 U.S.C. §3553(a)(2)(A) which requires a sentencing court to "impose a sentence sufficient, but not greater than necessary, to comply with . . . the need . . . to promote respect for the law and, to provide just punishment for the offense."

*Eighth,* we urge the Court to give some consideration to the harsh conditions Alvin experienced when he was in jail for about two and one-half months.  We further urge the Court to consider that, if additional incarceration is imposed, Alvin swill likely be subjected to similar conditions.

***Ninth,*** Alvin's compliance with pretrial supervision demonstrates that, if sentenced to a term of time served, he will continue to be compliant for the term of supervised release which will be imposed upon him.

## CONCLUSION

Based upon the foregoing, we submit a sentence of time served is a fair and just disposition in this case.

Dated:     August 15, 2022
              Bayside, NY

                          Respectfully submitted,
                          /s/
                          Jeffrey G. Pittell

cc:    Government counsel of record (By ECF)