M8M7FERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                         21 Cr. 412 (JSR)

ALVIN FERNANDEZ,

              Defendant.         Sentence
------------------------------x

                                       New York, N.Y.
                                       August 22, 2022
                                       4:10 p.m.

Before:

                     HON. JED S. RAKOFF,

                                District Judge

                          APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  MICAH F. FERGENSON
     Assistant United States Attorney

MAHER & PITTELL, LLP
     Attorney for Defendant
BY:  JEFFREY G. PITTELL

1         (Case called; appearances noted)

2         THE COURT:  Good afternoon.  Please be seated.

3         We're here for sentencing.  The first thing we need to
4    do, even though it is probably of the least interest to the
5    Court, is to calculate the sentencing guidelines.  The
6    presentence report says that the total offense level is 31,
7    criminal history category is II and the guideline range, which
8    of course is not binding on the Court, is therefore 121 to 151
9    months.

10        Any disagreement with that calculation from the
11   government?

12        MR. FERGUSON:  Your Honor, we're not challenging the
13   calculation, although, we stand by the plea agreements'
14   calculation.

15        THE COURT:  Well, you agree with the accuracy of the
16   calculation, correct?

17        MR. FERGUSON:  We are not disputing it, your Honor.

18        THE COURT:  No, that's not good enough.

19        I understand the government sometimes enters into
20   agreements based on its understanding of what the guidelines
21   should be, and then it finds out that, oh, no, they're somewhat
22   different, maybe something higher, and they, therefore, feel
23   bound to still adhere to their promise.  That, I accept.  But
24   that doesn't mean that they can't answer the Court's question
25   about a factual matter, which is:  As a factual matter, as a

legal and factual matter, has the probation office now correctly calculated the guidelines?

And the answer to that question should be easy in my court since, as I have now said, at least 100 times, I regard the sentencing guidelines as wholly irrational and deserving of no weight.  So, this is purely an exercise in what the law requires a court to do that will have no impact whatsoever on the sentence the Court will impose.  But we still should get it right.

So is the government's view that, as a factual and legal matter, the probation office calculation is correct; yes or no?

MR. FERGUSON:  Yes, your Honor.

THE COURT:  And defense counsel agrees?

MR. PITTELL:  I do.

THE COURT:  Okay.  Very good.  So I will adopt that calculation.  The total offense level is 31, the criminal history category is II, and the guideline range is 121 to 151 months, which is considerably in excess of any sentence I will hand out in this case to this defendant.  But now that we've got it done with, I adopt that calculation and adopt the presentence report.

Now let's get to substance, which is where we should sentence this defendant under Section 3553 of Title 18.

I'll ask counsel when they're addressing the Court to

1    go to the rostrum because you can take off your mask there and
2    it makes it much easier to understand what you're saying.
3            We'll begin with defense counsel.
4            MR. PITTELL:  Thank you, your Honor.  It's a relief to
5    be unmasked.
6            THE COURT:  Maybe I can move things along a little bit
7    here.  I will ask the government to confirm it, but my
8    understanding is that Mr. Fernandez is in the middle or, even
9    in broad terms, below the middle of the numerous defendants in
10   this case in terms of culpability.  I have, in the past, while
11   imposing much more severe sentences on those who were highly
12   culpable, imposed sentences as low as three or four months for
13   some of the less culpable persons.
14           However, and of course every case is very particular
15   to the individual, there are a couple of things here that seem
16   to cut against your client.  One in which the government
17   emphasizes several times is that when the defendant seemingly
18   became aware of the indictment, since it had been unsealed and
19   his codefendants had been arrested, not only did he not
20   surrender or take steps to try to surrender, but, more
21   importantly from my standpoint, he provided a false name upon
22   arrest.
23           What about that?
24           MR. PITTELL:  Judge, that issue came up at the bail
25   hearing.  I mean, Mr. Fernandez denied knowing that he had been

M8M7FERS

1  charged.

2  THE COURT:  Yes.  That's why I phrased it the way I
3  did.  I will assume that for today's purposes, but what about
4  the false name?

5  MR. PITTELL:  He was driving a car.  He was with his
6  wife, who is actually here in court, and he knew that his
7  license had expired.  So, that is why --

8  THE COURT:  Sorry.  It's coming back to me now, some
9  of the discussions we had previously.

10  MR. PITTELL:  So that is why he did not give his true
11  name to the officer.

12  THE COURT:  Doesn't it still show a state of mind,
13  that is, well, if you get caught and you're questioned by law
14  enforcement, if it's in your interest to lie, let's lie?

15  MR. PITTELL:  Absolutely.

16  I mean, it's giving an untruthful answer to a police
17  officer, it's evasive.  And, yeah, in hindsight, he should have
18  just given his real name.  And if he had gotten a summons, or
19  some traffic offense for driving without a license, he
20  shouldn't have done that.  I can't excuse it, I can only talk
21  about why, as I advocate in my sentencing memorandum, a
22  sentence of time served, I believe, is appropriate at this
23  point in this case.

24  THE COURT:  Well, you couldn't very well argue for
25  less than time served, so that would be rather novel in the

1  history of Anglo-American sentencing, but --

2      MR. PITTELL:  I don't want to be greedy about it.  I
3  just thought because he had done some time because it took two
4  months to get him here and then another two months to get the
5  bond signed, and then, even though it's not real time in the
6  sense of behind bars time, he was on home incarceration for two
7  months.  So I think that is really what I mean by the time
8  served.

9      I mean, what I try to do in this sentencing
10  submission -- and really what I try to do in every case, and
11  what I try to do in cases before you -- is I try and be as
12  thorough as I can in terms of what I write.  I usually, at the
13  end, give a laundry list of reasons.  A lot of times they point
14  to 3553(a) factors as to why whatever sentence I'm advocating
15  for is appropriate.

16      In this particular case, though, I want to briefly
17  point to two that I consider to be the most compelling.  One,
18  as you already mentioned, is that some of the other defendants
19  who have been sentenced, they had similar base offense levels,
20  similar -- I know it doesn't matter, but similar guideline
21  range.

22      THE COURT:  Well, as I say, everything is highly
23  individual.  At least some of them were considerably younger
24  than this defendant.  Not all, I think, but some of them.
25      MR. PITTELL:  I looked at that.  At the time of the

offense, or their arrest, or their last offense conduct, they were in, more or less, their mid-20s.  Mr. Fernandez, the last undercover sale, he was 31.  It's a difference, but not a generational difference.

THE COURT:  I wasn't thinking so much about that.  The argument that was made in some of those others cases was that the defendants had committed the offenses before they were fully mature, before their brain functions had reached total maturity.  Little harder to make that case here.

MR. PITTELL:  Right.  I'm not making that argument.

I mean, I know the brain function argument kind of ends at about age 25, but maturity, emotional maturity comes at different ages as opposed to physical maturity.  And that kind of goes into what I can say is the other one of the two compelling reasons, the maturity or the waking up, or the full realization that he finally had.  Well, it took 30 years, or at least it took him to reach age 30 or 31 to finally reach that point, but he realized that living this life of slinging drugs on a street corner in the Bronx is not the way to go.

This isn't an instance where someone has been arrested and then I've told them, change your life from today on.  He had changed his life, taken steps, moved to Pennsylvania, distanced himself from the Bronx, was not associating on a daily basis.  Because I've come to understand that everybody pretty much knows everybody.  I mean, some conspiracies, that's

not the case. But in this case, it was a more tightly knit group. He cut himself off from all of that, to his credit, and he's continued to do that.

Living with his wife, raising her kids, his daughter comes to visit. I think the two things that he did in terms of employment since he got out also shows maturity. Because of living through the pandemic, not being in jail, he saw a need for delivery services, tried to start a business with that. Once he realized he couldn't do it on his own, he went and just got a job a minimum wage job, frying chicken at a KFC franchise. His manager was impressed by him, and it's reflected in his letter, and now he's moving up the ladder. And he's been, for the last couple of months, a night manager. As his manager wrote in the letter, he's actually training him to be the manager of the entire store. So, that's a real sign of maturity. Came a little later, but it still seems like it's here to stay.

So I think if I had to point to one reason why I'm asking for the sentence that I'm asking, I think that's really the real reason.

THE COURT: I think that's a strong argument. But now what I've sometimes done in situations like this -- and again, every case is different -- where I thought, nevertheless, the amount of time served so far was not sufficient, is to impose weekends in a halfway house. I don't know whether you've

1  discussed that with your client or not.  That, of course, would
2  allow him to continue his employment.
3              MR. PITTELL:  I have discussed that with him and that
4  is -- the key thing is him being given an opportunity to
5  continue to be employed.
6              THE COURT:  What days and hours does he work?
7              MR. PITTELL:  I mean, I know right now he's working
8  the night shift until 11.  I don't know.  I'll have to ask him.
9              THE COURT:  Ask him.  Let's find out.
10             (Counsel conferred with defendant)
11             MR. PITTELL:  He says it could be arranged so that he
12  could only work weeknights.
13             THE COURT:  Okay.  Very good.
14             All right.  We'll come back to you in a minute,
15  because I'm sure there are other things you wanted to say, but
16  let me hear next from the government.
17             MR. PITTELL:  Okay.
18             MR. FERGUSON:  Just briefly, your Honor, I think the
19  Court has already hit on the two points that the government
20  would emphasize, which is that the defendant's relatively more
21  senior aged in the crew.  We believe that translates into a
22  higher level of culpability.
23             In addition, the circumstances of his arrest in
24  Oregon, the government would submit that the notion that he
25  didn't know that all the friends he grew up with and himself

had been indicted a month earlier after it had been unsealed is frankly ridiculous. There's just no way he didn't know. So, because I can't show a text message to the Court proving that, I would appeal to the Court's common sense, as we often do, that that simply is not the explanation here. So I think it is appropriately viewed through that lens, your Honor.

Unless the Court has specific questions, the government would rest there.

THE COURT: Thank you very much.

Anything further from defense counsel?

MR. PITTELL: No. Thank you.

THE COURT: All right. Well, I am persuaded, on the one hand, by the government, that regardless of the reason why he gave a false name when arrested, Mr. Fernandez did show that, even as recently as then, he had not fully come to grips with his responsibility as a citizen and as someone in this country to be candid, forthright, and accurate.

However, I agree with defense counsel that this is relatively small potatoes in the bigger picture, and that this defendant was not one of the major players in this conspiracy, and that many, though not all, of the factors that were present in the case of some of his codefendants who I sentenced to three our four months are present here.

So, if that were the end of the subject, I would sentence the defendant to five months in prison. However, I

think his employment is very important both to him, his family, and society. So instead, I will impose a situation where he will be, in terms of present incarceration, sentenced to time served, but a condition of his release, or supervised release, will be that he serves the first 15 weekends in a halfway house. So let's put that into a more formal fashion.

The sentence of the Court is that the defendant is sentenced to time served to be followed by three years of supervised release on terms I will get to in a moment.

No fine will be imposed because the Court makes the finding this defendant is not in a position to pay any meaningful fine in the foreseeable future. There is, however, a $100 mandatory special assessment that must be paid.

I take it the government is not seeking forfeiture; is that correct?

MR. FERGUSON: That's correct.

THE COURT: In terms of supervised release, the mandatory conditions are that the defendant must not commit any other federal, state, or local crime; he must not unlawfully possess a controlled substance; that within 15 days of his release from imprisonment -- essentially, now -- he will submit to one drug test to be followed by two periodic drug tests thereafter as determined by the probation office; and he must cooperate in the collection of DNA.

There will also be imposed the standard conditions 1

through 12. They appear on the face of the judgment, but also will be gone over with the defendant by the probation office when he reports to begin his period of supervised release. And he must report to begin his period of supervised release within 72 hours of his release from incarceration.

Finally, there are the special conditions:

First, that for the first period of his supervised release, the first 15 weekends of supervised release will be spent at a halfway house designated by the probation office to which he will report to no later than 7 p.m. on Fridays, and from which he will be released no earlier than 7 a.m. on Mondays;

Second, that the defendant will participate in an outpatient treatment program for drugs and alcohol, the standard terms and conditions;

Third, that the defendant will be supervised by his district of residence.

Now, before I advise the defendant of his right to appeal, anything else from the government?

MR. FERGUSON: The government would move to dismiss any open counts.

THE COURT: That motion is granted.

Anything from the defense?

MR. PITTELL: No. Thank you.

THE COURT: So, Mr. Fernandez, you have a right to

M8M7FERS

1  appeal the sentence.
2         Do you understand that?
3         THE DEFENDANT:  Yes, your Honor.
4         THE COURT:  If you can't afford counsel for the
5  appeal, the Court will appoint one for you free of charge.
6         Do you understand that?
7         THE DEFENDANT:  Yes, sir.
8         THE COURT:  Very good.  Thanks a lot.
9         MR. PITTELL:  So he works nights and he said it could
10 be arranged so that he will work all weeknights.
11        THE COURT:  Thank you.
12        Mr. Fernandez, this is totally up to you.  I don't
13 care one way or another.  Do you want to report to the halfway
14 house at 7 p.m. on Fridays and released at 7 a.m. on Mondays,
15 which is the normal situation, or would you prefer that you
16 report at 7 a.m. on Saturday and are released at 7 p.m. on
17 Monday?
18        THE DEFENDANT:  The first one is --
19        THE COURT:  The first one.  That's the one we have in
20 place.
21        Thanks very much.
22        THE DEFENDANT:  All right.
23        (Adjourned)
24
25